**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4389-18
                    A-4959-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

KAREEM A. MCNEIL,
a/k/a MCNEIL KAREEM,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TAHJ M. LAWS,

      Defendant-Appellant.

_____

Submitted January 31, 2022 – Decided August 9, 2022

Before Judges Messano and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 17-05-0285.

Joseph E. Krakora, Public Defender, attorney for appellant Kareem A. McNeil (Tamar Y. Lerer, Assistant Deputy Public Defender, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, attorney for Tahj M. Laws (Ruth E. Hunter, Designated Counsel, on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent in A-4389-18 (Daniel Opatut, Assistant Prosecutor, of counsel and on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent in A-4959-18 (Brittany Saxton, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Sometime before 5:00 p.m. on May 25, 2013, nineteen-year-old Devahje Bing was shot and killed outside the Oakland Park Apartments in Trenton. The shooting occurred on the heels of a fistfight between Bing and defendant Tahj M. Laws, who tried to end the skirmish by firing a "hood gun"[1] at Bing. That gun was inoperable. Bing walked away; Laws walked over to defendant Kareem

---

[1] According to the State, a "hood gun" is a "community gun." See N.J.S.A. 2C:39-4(a)(2) (defining a community gun as "a firearm that is transferred among, between[,] or within any association of two or more persons who, while possessing that firearm, engage in criminal activity or use it unlawfully against the person or property of another").

A. McNeil and exchanged the inoperable gun for a loaded silver .38 caliber revolver. Within seconds, Laws fired multiple shots at Bing from fifteen feet away. Bing later died at a local hospital, having succumbed to a bullet wound to the chest. At the time of the homicide, Laws was fifteen years old; McNeil was twenty-two years old.

Surveillance video from cameras located at the Oakland Park Apartments and the nearby Martinez Deli and Grocery captured the weapons exchange. According to the footage, the exchange was witnessed by Davion Fenderson and Leigh Burnett, who later gave statements to police confirming the video depicted them, Bing, and Laws. Fenderson and Burnett heard four gunshots right after McNeil handed Laws the revolver. Fenderson also told police about conversations he had separately with Bing and Laws a week or two before the incident. Burnett disclosed he had seen McNeil carrying a small, grey gun.

Police charged Laws with acts of delinquency which, if committed by an adult, would have constituted murder and weapons offenses. In June 2014, a Family Part judge granted the State's motion for involuntary transfer of jurisdiction to the adult court. In May 2017, Laws and McNeil were charged in a Mercer County indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (a)(2) (count one); second-degree possession of a weapon for an unlawful

purpose, N.J.S.A. 2C:39-4(a) (count two); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three).

Pertinent to this appeal, the motion judge granted the State's ensuing applications to admit surveillance video evidence from the Oakland Park Apartments (the May 2, 2018 order), and the Big Oak Deli, formerly known as the Martinez Deli and Grocery (the June 12, 2018 order). The judge also granted the State's motion to admit prior bad acts evidence pursuant to N.J.R.E. 404(b) or as intrinsic to the charged crimes (the June 27, 2018 order). All three orders were accompanied by well-reasoned written decisions.

On September 11, 2018, defendants entered back-to-back contingent pleas before another judge. Laws pled guilty to count one, as amended to first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1). In exchange, the State agreed to recommend a twenty-year prison sentence, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The parties and the trial judge executed a supplemental plea form for a non-negotiated plea based on the trial judge's representation that he would sentence defendant to an eighteen-year prison term, subject to NERA. Laws reserved the right to argue for less prison time at sentencing. Assault charges filed against Laws, stemming from an incident that occurred while he was in jail pending trial, were expressly excluded from the

4

plea agreement. Immediately thereafter, McNeil pled guilty to count one, as amended to second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1). Although designated as an "open plea" because the State did not recommend a specific sentence, the State agreed to a concurrent, four-year "flat" sentence on McNeil's violation of probation.

Defendants' plea agreements contained common exceptions and conditions that are relevant to this appeal. Defendants reserved the right to appeal the motion judge's orders pertaining to prior bad acts evidence; the admissibility of the surveillance videos; and "any other motion before the court" for which an order was entered. See R. 3:9-3(f). Defendants agreed to pay restitution as determined by the judge at sentencing.

Prior to sentencing, Laws moved to withdraw his guilty plea, contending the record only supported passion/provocation manslaughter because, having been previously robbed by Bing, Laws feared for his life when they fought on the day of the incident. Immediately following argument on April 5, 2019, the trial judge issued a cogent oral decision, denying the motion. The judge issued an accompanying order that same day.

The following month, Laws was sentenced to an eighteen-year prison term, subject to NERA; McNeil was sentenced to an aggregate ten-year prison

term, subject to NERA on the manslaughter conviction. Based on the State's itemized restitution submission, and with defendants' consent, the judge imposed joint and several restitution in the amount of $18,637. Both defendants appealed, and we consolidated the appeals for the purpose of issuing a single opinion.

On appeal, defendants raise two overlapping points challenging the motion judge's rulings admitting the surveillance video recordings and prior bad acts evidence. Alternatively, defendants each seek a remand for resentencing, asserting their sentences are excessive and the judge failed to conduct an ability-to-pay hearing before imposing restitution. More particularly, McNeil argues:

<u>POINT I</u>

BECAUSE THE VIDEOS WERE NOT APPROPRIATELY AUTHENTICATED, THE TRIAL COURT ERRED IN RULING THAT THEY WERE ADMISSIBLE.

<u>POINT II</u>

THE TRIAL COURT ERRED IN ADMITTING THE OTHER-BAD-ACT EVIDENCE.

<u>POINT III</u>

THE MATTER MUST BE REMANDED FOR AN ABILITY-TO-PAY HEARING AND RESENTENCING.

6

<span>A-4389-18</span>

In his brief, Laws raises similar arguments in points I and II, and raises additional contentions in points III through VI:

POINT I

IT WAS AN ABUSE OF DISCRETION FOR THE COURT TO FIND ADMISSIBLE [N.J.R.E.] 404(b) EVIDENCE OF [LAWS'] ALLEGED PRIOR REQUEST FOR A GUN BECAUSE THE EVIDENCE WAS NOT CLEAR AND CONVINCING AND THE PROBATIVE WORTH OF THE EVIDENCE WAS OUTWEIGHED BY ITS POTENTIAL FOR UNDUE PREJUDICE.

POINT II

THE COURT IMPROPERLY ADMITTED THE VIDEO SURVEILLANCE TAPES BECAUSE THE TESTIMONY DID NOT ESTABLISH THAT THEY WERE "AN ACCURATE REPRODUCTION" OF THE CRIME, AND THUS, THE TAPES WERE NOT PROPERLY AUTHENTICATED.

POINT III

THE TRIAL COURT'S DENIAL OF [LAWS'] MOTION TO WITHDRAW HIS GUILTY PLEA WAS "CLEARLY ERRONEOUS" BECAUSE THE COURT IGNORED PLAUSIBLE FACTS SUPPORTING PASSION/PROVOCATION MANSLAUGHTER AND MADE CREDIBILITY DETERMINATIONS WITHOUT HEARING TESTIMONY.

POINT IV

A REMAND FOR RESENTENCING PURSUANT TO MILLER V. ALABAMA, 567 U.S. 460, 471 (2012), IS REQUIRED BECAUSE THE TRIAL COURT DID

7

NOT RECOGNIZE OR UNDERSTAND "HOW CHILDREN ARE DIFFERENT," AND BECAUSE THE SENTENCE WAS NOT BASED ON "COMPETENT REASONABLE EVIDENCE." STATE V. CASE, 220 N.J. 49, 64 (2014).

## POINT V

ADDITIONALLY, THIS COURT SHOULD REMAND FOR RESENTENCING BECAUSE THE COURT IMPOSED AN EXCESSIVELY DISPARATE SENTENCE AS COMPARED TO THE ADULT CODEFENDANT, AND FOR THE TRIAL COURT TO RECONSIDER [LAWS'] SENTENCE BASED ON THE NEW MITIGATING FACTOR, "THE DEFENDANT WAS UNDER [TWENTY-SIX] YEARS OF AGE AT THE TIME OF THE COMMISSION OF THE OFFENSE," N.J.S.A. 2C:44-1(b)(14), AND CONDUCT AN ABILITY[-]TO[-]PAY HEARING.

## POINT VI

THIS COURT SHOULD REVERSE THE ORDER WAIVING JURISDICTION TO ADULT COURT AND REMAND THE MATTER FOR A NEW WAIVER HEARING BECAUSE THE STATE FAILED TO SET FORTH REASONS PURSUANT TO THE FORMER WAIVER STATUTE, N.J.S.A. 2A:4A-26, AND FAILED TO CONSIDER THE FACTORS UNDER THE AMENDED WAIVER STATUTE, N.J.S.A. 2A:4A-26.1[(c)](3), WHICH SHOULD APPLY RETROACTIVELY TO [LAWS].
[(Not raised below).]

We affirm defendants' convictions and sentences, but vacate the restitution order and remand solely for the court to reconsider and determine the restitution amount, if any, based on defendants' ability to pay.

## I.

In McNeil's point I and Laws' point II, defendants contend the motion judge erroneously admitted the surveillance videos of the incident because the State failed to properly authenticate the video. Laws further argues the State failed to demonstrate an unbroken chain of custody. The judge rejected these evidentiary assertions, as do we.

The motion judge conducted separate evidentiary hearings regarding the video recordings recovered from the apartment complex and those recovered from the deli. During the course of five days in April, May, and June 2018, the State presented the testimony of three witnesses as to the video recordings from the Oakland Park Apartments: Jason Snyder, a detective with the Trenton Police Department's (TPD) Homicide Unit; Ralph Dowker, the owner of the company that installed the thirty-two surveillance cameras at the complex; and William Popovic, the equipment supervisor with MAGLOCLEN, a law enforcement assistance company funded by the Department of Justice.

9

Snyder responded to the Oakland Park Apartments on the date of the incident. He was well-familiar with the complex, having responded to calls at the location between 500 and 1,000 times in his law enforcement career. Snyder previously downloaded surveillance footage from the complex's cameras. On the date of the incident, the video monitors in the complex's security office displayed a live feed, which was consistent with Snyder's observations of the area before he entered the office.

Snyder detailed the process he employed to obtain the footage for the shooting in this case, limiting his request to those eight cameras that displayed different angles of the events. When Snyder returned to police headquarters, he reviewed the footage, which accurately depicted the areas and structures the cameras faced. He noticed no additions, deletions, or modifications to the camera angles. On cross-examination, Snyder acknowledged he maintained the disk containing the footage with the case file in his desk drawer but did "not put the original in evidence" in accordance with formal procedure.

Dowker testified to the installation, servicing, design, and security of the complex's camera system. He explained the cameras were motion activated and the recordings were not capable of manipulation. The camera system was

10

monitored "remotely on a twenty-four-hour basis," and was functioning properly on the date of the incident.

Popovic enhanced the surveillance footage following Snyder's request "to shorten the video[s] and put [them] in chronological order." Snyder also sought to "zoom in on sections; slow motion or pause a different section of the video." Snyder requested a single video focusing on defendants, specifically showing the gun exchange and shooting. Popovic compiled two DVDs pursuant to Snyder's request.

The motion judge conducted a separate hearing on the deli's video surveillance system, during which the State presented the testimony of Ronald Kinnunen, a detective assigned to the TPD's Technical Services Unit, and Snyder. Kinnunen explained the deli's surveillance system. The day after the shooting, Kinnunen obtained footage from thirteen of the store's sixteen cameras, spot checking the videos to verify their accuracy.

Snyder obtained the disk from Kinnunen, acknowledging he first watched the surveillance footage in April 2018, after mistakenly placing the disks in another homicide case file. The footage was about ten hours in duration and ended after Bing was shot and emergency services personnel responded to the scene. Because the time stamp on the videos was accelerated, Snyder ensured

their accuracy by comparing them with the time stamps of the complex's video recordings. Snyder confirmed the deli's videos were in the same condition as they were when he found them in his case file, without any deletions, additions, or corrections. Noting the videos were "clear," Snyder identified defendants, Fenderson, Burnett, and "people on the corner," who "all react[ed] at the same time as if they're responding to gunfire."

In sum, the surveillance videos were admissible because they were properly authenticated by the proffered testimony at both hearings. The motion judge squarely addressed the issues raised in view of the governing law under N.J.R.E. 901, and made credibility and factual findings that warrant our deference. See, e.g., State v. Garcia, 245 N.J. 412, 430 (2021). The judge credited the detectives' testimony, including Snyder's familiarity with the complex's surveillance system and Kinnunen's knowledge of the deli's system. The claimed gaps in the videos' chain of custody merely bear upon the weight of the evidence, not its admissibility. State v. Morton, 155 N.J. 383, 446-47 (1998); see also State v. Mosner, 407 N.J. Super. 40, 62 (App. Div. 2009). We therefore conclude the motion judge did not abuse his discretion in admitting the videos. See State v. McLaughlin, 205 N.J. 185, 211 (2011) (applying an abuse of discretion scope of review on the trial court's evidentiary rulings).

12

## II.

Nor are we persuaded by the arguments raised in McNeil's point II and Laws' point I. To give context to defendants' claims, we summarize the testimony adduced during the three-day testimonial hearing.

Fenderson testified about separate conversations he had with Bing and Laws a week or two before the shooting. Bing said he had robbed Laws of fifty dollars and asked Fenderson for a gun. The following day or so, Laws told Fenderson that Bing had robbed him. Laws asked Fenderson for a gun "quite a few times" in the days leading up to the shooting. Fenderson separately told Bing and Laws he did not own a gun. Acknowledging he ran in "the same circles" as McNeil, Fenderson testified he had seen McNeil carry a .38 revolver sometime prior to the incident.

Burnett testified he knew McNeil carried a small, grey gun. After Bing was killed, Burnett learned the gun was a .38 caliber revolver. Burnett saw McNeil "days before" the shooting with the gun. McNeil was "flashing it," meaning he pulled out the gun and played with it.

Burnett also claimed in April 2016, while incarcerated on an assault charge, he was lodged in the same jail as McNeil. Before Burnett was released on bond, McNeil assaulted him, stating: "You gonna make it right." At some

13

later point, Burnett was arrested on a robbery charge, again detained in the same jail as McNeil, and placed in protective custody. Whenever Burnett left his cell, McNeil made "little guns with his hands pointed at" him. McNeil also threatened the mother of Burnett's child and his niece. Burnett said the threats occurred daily.

The State presented testimony of the Mercer County Jail's former deputy warden, Phyllis Oliver, and the jail's transportation sergeant, Shawn Palmer. Oliver confirmed inmates placed in protective custody could see and hear the inmates housed in the A-Pod, where McNeil was lodged. Palmer testified on June 6, 2016, he responded to a "loud disturbance" in one of the holding cells under his supervision. McNeil "threw a punch" at Burnett, who was on the floor of the cell when Palmer entered.

The motion judge granted the State's motion, subject to exceptions that are not at issue in this appeal. The judge admitted the testimony of Fenderson and Burnett regarding McNeil's possession of the gun in the days leading to the incident as intrinsic to the weapons offenses and "as appropriate background" to the homicide incident. Similarly, the judge found evidence of the robbery "[wa]s relevant to background as intrinsic evidence," and alternatively admissible under N.J.R.E. 404(b). The judge seemingly found Laws' requests

14

for a gun were admissible to demonstrate his motive or intent. Turning to Burnett's allegations that McNeil threatened and assaulted him in jail, the judge was persuaded the testimony was admissible to demonstrate McNeil's consciousness of guilt.

On appeal, defendants challenge the motion judge's decision. McNeil maintains the judge erroneously admitted the testimony of: (1) Fenderson and Burnett that McNeil possessed a gun prior to the shooting; (2) Burnett that McNeil threatened and assaulted him in jail; and (3) Oliver and Palmer because "it served only to bolster Burnett's inadmissible testimony." McNeil contends the evidence either was not relevant or not clear and convincing. Laws maintains the judge erred by admitting Fender's testimony that: (1) Laws requested a gun from Fenderson; and (2) Bing robbed Laws. He contends evidence of the robbery and his alleged request for a gun days before the incident were not intrinsic evidence of the homicide. Laws also asserts Fenderson's testimony fails prong three of the Cofield[2] test because it was based on unreliable hearsay.

---

[2]  State v. Cofield, 127 N.J. 328, 338 (1992).

"Trial court decisions concerning the admission of other-crimes evidence should be afforded 'great deference,' and will be reversed only in light of a 'clear error of judgment.'" State v. Gillispie, 208 N.J. 59, 84 (2011) (quoting State v. Barden, 195 N.J. 375, 390-91 (2008)). At the time of the hearing in this matter, N.J.R.E. 404(b) provided:[3]

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

In Cofield, our Supreme Court established a four-prong test to determine the admissibility of other-crimes evidence under N.J.R.E. 404(b):

> 1.  The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2.  It must be similar in kind and reasonably close in time to the offense charged;
>
> 3.  The evidence of the other crime must be clear and convincing; and
>
> 4.  The probative value of the evidence must not be outweighed by its apparent prejudice.

---

[3] The Rule was amended, effective July 1, 2020, to reflect restyling revisions, without altering its substance. See Biunno, Weissbard, & Zegas, Current N.J. Rules of Evidence, foreword (2022-23).

[127 N.J. at 338.]

Whenever other-wrongs or bad-acts evidence is sought to be admitted, the trial court must make a threshold determination "whether the evidence relates to 'other crimes,' and thus is subject to continued analysis under Rule 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence rules relating to relevancy, most importantly Rule 403." State v. Rose, 206 N.J. 141, 179 (2011); see also State v. Sheppard, 437 N.J. Super. 171, 193 (App. Div. 2014) (holding that if the evidence is intrinsic, "N.J.R.E. 404(b) does not apply because the evidence does not involve some other crime, but instead pertains to the charged crime"). To determine evidence that is "intrinsic" to the crime, the Court in Rose adopted the test established in United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010), i.e., evidence is considered intrinsic if it "directly proves" the crime charged or if the other wrongs or bad acts in question were performed contemporaneously with, and facilitated, the commission of the charged crime. Rose, 206 N.J. at 180 (quoting Green, 617 F.3d at 248-49).

Initially, we find no error in the judge's decision, admitting evidence of McNeil's prior gun possession. As the motion judge recognized, McNeil was charged with possession of a weapon for an unlawful purpose and unlawful

possession of a weapon. The State was required to present evidence that McNeil, who was vicariously charged with Laws' actions, knowingly possessed a handgun and possessed it with a purpose to use it against another's person or property. Because the evidence of McNeil's prior gun possession directly proved the charged offenses, it was intrinsic to the charged crimes, and thus, exempt from the strictures of N.J.R.E. 404(b). Rose, 206 N.J. at 177, 180. For similar reasons, we reach the same conclusion regarding Laws' request for a gun from Fenderson in the days leading to the shooting.

Even if not intrinsic, the evidence was admissible under N.J.R.E. 404(b). When motive or intent are at issue, New Jersey courts "'generally admit a wider range of evidence.'" State v. Jenkins, 178 N.J. 347, 365 (2004) (quoting State v. Covell, 157 N.J. 554, 565 (1999)). "That includes evidentiary circumstances that 'tend to shed light' on a defendant's motive and intent or which 'tend fairly to explain his actions,' even though they may have occurred before the commission of the offense." Covell, 157 N.J. at 565 (quoting State v. Rogers, 19 N.J. 218, 228 (1955)).

We also agree with the judge that Burnett's testimony about McNeil's threats and assault in jail were not subject to exclusion under N.J.R.E. 404(b). See e.g., State v. Yough, 208 N.J. 385, 402 n.9 (2011) (recognizing threatening

or intimidating a witness after the crime "would be admissible to demonstrate consciousness of guilt under N.J.R.E. 404(b)"). Indeed, "[o]ur courts have long held that evidence of threats made by a defendant to induce a witness not to testify is admissible because it illuminates the declarant's consciousness of guilt." State v. Buhl, 269 N.J. Super. 344, 364 (App. Div. 1994); see also State v. Goodman, 415 N.J. Super. 210, 232 (App. Div. 2010). Evidence that a defendant instructed a witness not to testify is similarly admissible as inconsistent with innocence. See State v. Williams, 190 N.J. 114, 120, 129-30 (2007).

Lastly, we turn to the admissibility of the evidence of the robbery. Fenderson's testimony that Laws said Bing had robbed him one week before the shooting is admissible as a statement against interest, N.J.R.E. 803(c)(25). Bing's commission of the robbery was not an "other crime" previously committed by Laws and, as such, the statement was not subject to scrutiny under N.J.R.E. 404(b). We also agree with the motion judge that the evidence bears on Laws' motive. Accord Rose, 206 N.J. at 163 (finding that "why [the] defendant wanted [the victim] killed" was "a crucial piece of evidence").

We part company, however, with the judge's decision to admit Fenderson's testimony that Bing said he had robbed Laws. At issue is the following

testimony: "One night, [Bing] came up to me and he told me that basically said he just did some BS [sic]. And I asked him what happened, and he told me that he robbed [Laws], and somebody that was with [Laws]. He robbed them for their money." Unlike Laws' testimony, which was admissible under N.J.R.E. 803(c)(25), the statement of the decedent was inadmissible hearsay, for which no exception applied. However, because the testimony was brief and corroborated by Laws' testimony, which was admissible, we deem the error harmless.

## III.

In his point III, Laws argues the trial judge erroneously denied his motion to withdraw his guilty plea. Quoting the Court's seminal decision in State v. Slater, 198 N.J. 145, 159 (2009), Laws argues the trial judge ignored "particular, plausible facts" in the record that supported passion/provocation manslaughter. Laws further asserts he was entitled to an evidentiary hearing on his claims. We are unpersuaded by any of his contentions.

Before the trial judge, Laws claimed "he [wa]s only guilty of manslaughter under the passion/provocation theory," having been previously robbed by Bing, and he feared for his life when they fought on the day of the incident. In a detailed oral decision, the judge highlighted the plea proceedings – including

20

Laws' demeanor during the plea colloquy and his factual basis – and evaluated defendant's application pursuant to the Slater factors. Notably, the judge found Laws failed to submit a certification, delineating the facts supporting his passion/provocation theory. Accordingly, the judge found defendant's "bare assertion" did not support a colorable claim of innocence. See id. at 158. The judge elaborated:

> The defendant hasn't presented any kind of specific or credible facts. He hasn't pointed to any facts in the record that would buttress his claim. And this is a case where there was extensive discovery, there was video discovery that was referenced but not shown during the course of the plea and my obligation during a hearing of this nature is not to turn this matter into a trial. I'm satisfied that the defendant's assertion of innocence here is pretty much just a blanket statement unsupported by evidence and it is not made in reliance on any particular or plausible facts.

Although Laws initially equivocated during the plea hearing, claiming he was "under the influence" at the time of the shooting, his ensuing factual basis established the elements of aggravated manslaughter.

> DEFENSE COUNSEL: Tahj, this incident happened five years [a]go?
>
> DEFENDANT: Yes.
>
> DEFENSE COUNSEL: And it's fair to say that you've had some difficulty remembering some of this, correct?

21

DEFENDANT:  Yes.

DEFENSE COUNSEL:  However, we did review multiple videos . . .

DEFENDANT:  Yes.

DEFENSE COUNSEL: . . . and discovery?

DEFENDANT:  Yes.

DEFENSE COUNSEL:  And from that you did view an altercation with Mr. Bing?

DEFENDANT:  Yes.

DEFENSE COUNSEL:  And then you ran after Mr. Bing?

DEFENDANT:  Yes.

DEFENSE COUNSEL:  The first weapon did not discharge, correct?

DEFENDANT:  Yes.

DEFENSE COUNSEL:  You received a second weapon?

DEFENDANT:  Yes.

DEFENSE COUNSEL:  And shot it multiple times?

DEFENDANT:  Yes.

DEFENSE COUNSEL:  While Mr. Bing was running away?

22

DEFENDANT:  Yes.

DEFENSE COUNSEL:  And you knew by firing multiple shots that that would cause death?

DEFENDANT:  Yes.

DEFENSE COUNSEL:  Nothing further, Your Honor.

THE COURT:  How close were you to him when you were following and shooting?

DEFENDANT:  About fifteen feet.

Defendant's sworn testimony established "defendant was aware of and consciously disregarded a substantial risk of death, i.e., a probability that death would result, and that the defendant manifested extreme indifference to human life."  State v. Cruz, 163 N.J. 403, 417 (2000).  Those facts do not support passion/provocation manslaughter, which occurs when a crime that "would otherwise be murder . . . 'is committed in the heat of passion resulting from a reasonable provocation.'"  State v. Galicia, 210 N.J. 364, 368 (2012) (quoting N.J.S.A. 2C:11-4(b)(2)).  For passion/provocation manslaughter to apply, there must be (1) reasonable and adequate provocation; (2) a lack of time for the defendant to cool off between the provocation and the killing; (3) actual provocation of the defendant; and (4) the defendant must not have cooled off before committing the act.  Id. at 379.

A-4389-18

Laws failed to demonstrate he was reasonably or adequately provoked. An "adequate provocation" is one in which the "'loss of self-control is a reasonable reaction' to the provocation." State v. Docaj, 407 N.J. Super. 352, 366 (App. Div. 2009) (quoting State v. Mauricio, 117 N.J. 402, 412 (2009)). Mutual combat may constitute adequate provocation when (1) the "contest [is] waged on equal terms and no unfair advantage is taken of the deceased"; (2) a defendant formed the intent to cause serious harm "in the heat of the encounter"; and (3) if the fight reaches a level of "actual physical contact" or serious threat "sufficient to arouse the passions" of a reasonable person. State v. Crisantos, 102 N.J. 265, 274-75, 275 n.8 (1986) (internal quotation marks omitted).

Here, mutual combat was not an adequate provocation because Laws was the only person who was armed. Thus, the fight was not on equal terms. Even if there were adequate provocation from the prior robbery, which there was not, Laws had ample opportunity to "cool off." Galicia, 210 N.J. at 379. We therefore discern no abuse of discretion in the trial judge's decision. See Slater, 198 N.J. at 156.

IV.

We also are unpersuaded by Laws' belated contention, raised in his point VI, that he is entitled to a new waiver hearing because the State failed to provide

24

the Family Part judge with a statement of reasons supporting its waiver motion under N.J.S.A. 2A:4A-26.1, and its predecessor, N.J.S.A. 2A:4A-26. Before the trial court, Laws never sought clarification of the prosecutor's reasons for seeking a waiver. He also never claimed the prosecutor abused his discretion in seeking the waiver. Laws' motion to withdraw his guilty plea did not include a request for a new waiver hearing with a written statement of reasons submitted by the prosecutor and reviewed by the Family Part judge. On appeal, Laws does not expressly seek reversal of his convictions. Instead, he argues a remand is necessary for a new waiver hearing. Laws' contentions are misplaced.

Laws was fifteen years old when he committed the homicide on May 25, 2013. At that time, N.J.S.A. 2A:4A-26(a) permitted, in pertinent part, involuntary waiver of jurisdiction to the adult court if the juvenile was fourteen years old or older when the acts of criminal homicide and possession of a firearm for an unlawful purpose were committed.[4] The burden then shifted to the

---

[4]  The Family Part judge properly ordered waiver of all counts, including unlawful possession of a weapon, recognizing "once probable cause is found as to any Chart 1 offense, jurisdiction of all offenses arising out of the same transaction will merge into the waived proceeding." See, e.g., State v. R.L.P., 159 N.J. Super, 267, 271-72 (App. Div. 1978).

juvenile to demonstrate "the probability of his rehabilitation" by age nineteen. N.J.S.A. 2A:4A-26(e).

However, under the statutory amendments, effective March 14, 2000, rehabilitation hearings were eliminated "for offenders, aged [sixteen] and over who [we]re charged with the most serious offenses under the Act." John J. Farmer, Jr. & Paul H. Zoubek, Off. of the Att'y Gen., Juvenile Waiver Guidelines 2 (2000) (AG Guidelines) (emphasis added).[5] Pursuant to the AG Guidelines, prosecutors were required to consider certain factors prior to seeking involuntary waiver of this group of older juvenile offenders, id. at 5-6, and "prepare a written statement of reasons for waiver," id. at 7.

Pertinent to this appeal, the AG "[G]uidelines appl[ied] only to those cases in which the juvenile [wa]s not permitted to overcome the waiver application by showing that the probability of rehabilitation by the use of the procedures, services[,] and facilities available to the court prior to the juvenile reaching the age of [nineteen] substantially outweighs the reasons for waiver." Id. at 3 (citing N.J.S.A. 2A:4A-26(e)). In the present matter, after the State presented probable cause that Laws committed the offenses charged in Phase I of the waiver

_____

[5] https://www.nj.gov/oag/dcj/agguide/pdfs/AGJuvenile-Waiver-Guidelines.pdf.

hearing, fifteen-year-old Laws was afforded the opportunity to present evidence in Phase II that he could be rehabilitated by age nineteen. In view of Laws' age, the State was not required to file a statement of reasons with its waiver motion under then-enacted N.J.S.A. 2A:4A-26.

We briefly address Laws' argument that the present waiver statute should be applied retroactively. In August 2015, N.J.S.A. 2A:4A-26 was repealed and replaced with N.J.S.A. 2A:4A-26.1, effective March 1, 2016. L. 2015, c. 89, § 6. Among other revisions, the new waiver statute increased the age of involuntary waiver to fifteen and required the prosecutor to file "a written statement of reasons clearly setting forth the facts used in assessing all factors contained [elsewhere in the statute], together with an explanation as to how evaluation of those facts support waiver for each particular juvenile." N.J.S.A. 2A:4A-26.1(a)

Stating the terms of N.J.S.A. 2A:4A-26.1 were "plain and unambiguous," the Court in State v. J.V., 242 N.J. 432 (2020) held, "the Legislature intended the statute to apply prospectively to those juvenile waiver hearings conducted after the statute became effective." Id. at 435; see also State in Int. of J.D., 467 N.J. Super. 345, 354 (App. Div. 2021) (comparing the former and revised versions of the waiver statute and concluding "the Legislature[ made a]

conscious choice to have the current version apply to all waiver hearings taking place after March 1, 2016, the effective date of the new statute"). We therefore reject Laws' retroactivity assertions.

V.

We turn to defendants' independent sentencing arguments before we address their mutual request for a remand for the judge to conduct an ability-to-pay hearing. We review the trial judge's sentencing determinations under a highly deferential standard. State v. Fuentes, 217 N.J. 57, 70 (2014).

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). The reviewing court must affirm the sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"While the sentence imposed must be a lawful one, the court's decision to impose a sentence in accordance with the plea agreement should be given great respect, since a 'presumption of reasonableness . . . attaches to criminal sentences imposed on plea bargain defendants.'" State v. S.C., 289 N.J. Super.

28

61, 71 (App. Div. 1996) (quoting State v. Sainz, 107 N.J. 283, 294 (1987)). An appellate court may not substitute its judgment for that of the sentencing court, provided the "aggravating and mitigating factors are identified [and] supported by competent, credible evidence in the record." Case, 220 N.J. at 65.

A.

Laws primarily argues the trial judge failed to consider his youth at the time he committed the offense. Laws also claims his sentence was "excessively disparate" to the sentence imposed on McNeil. We are not convinced.

In sentencing Laws to an eighteen-year prison term, as permitted under the plea agreement, the judge thoroughly considered the circumstances of the offense and Laws' characteristics, including his juvenile record. The judge found aggravating factors three (risk of re-offense) and nine (deterrence), N.J.S.A. 2C:44-1(a)(3) and (a)(9), "very clearly" outweighed mitigating factor six (defendant "will compensate the victim") and thirteen ("The conduct of a youthful defendant was substantially influenced by another person more mature than the defendant"), N.J.S.A. 2C:44-1(b)(6) and (b)(13). Because the present offense constituted Laws' first indictable conviction, the judge expressly declined to find aggravating factor six, N.J.S.A. 2C:44-1(a)(6) ("defendant's prior criminal record").

29                                                        A-4389-18

Initially, we reject Laws' argument that the judge improperly found aggravating factor three based on his youth. This is not a case in which the judge considered youth as an aggravating factor in contravention of the rule recently announced by the Supreme Court in State v. Rivera, 249 N.J. 285 (2021). In Rivera, the Court held a defendant's "youth may be considered only as a mitigating factor in sentencing and cannot support an aggravating factor." Id. at 303. In that case, the sentencing court speculated that the defendant would have engaged in other criminal conduct but did not have the opportunity to do so because of her youth. Id. at 302. Here, by contrast, the trial judge commented on the number of Laws' "prior adjudications of delinquency," which were actually committed in a short time span, and that his "prior custodial records show[ed] aggressive behaviors."

Further, Laws' reliance on Miller v. Alabama is misplaced. In that case, the United States Supreme Court recognized the differences between juvenile and adult offenders. 567 U.S. at 471; see also State v. Zuber, 227 N.J. 422, 446-47 (2017) (adopting the Miller standard in New Jersey). Importantly, however, Miller, applies only to cases in which juvenile offenders are charged with life sentences without parole. 567 U.S. at 470. Although our Supreme Court has extended the holding in Miller to "a sentence that is the practical equivalent of

life without parole," <u>Zuber</u>, 227 N.J. at 446-47, that is not the case here. Defendant's eighteen-year NERA prison term is not the practical equivalent of a life sentence.[6]

Finally, Laws' disparate sentencing argument lacks sufficient merit to merit discussion in a written opinion. <u>R.</u> 2:11-3(e)(2). We simply add, the sentence imposed was commensurate with Laws' role in the offense. In sum, the trial judge did not abuse his discretion in applying and weighing the applicable aggravating and mitigating factors. Nor does the sentence shock the judicial conscience. <u>See</u> <u>Roth</u>, 95 N.J. at 364-65.

B.

McNeil generally challenges the judge's assessment of aggravating and mitigating factors,[7] emphasizing the judge erroneously placed great weight on

---

[6] Nor does the Court's recent companion decision in <u>State v. Comer</u>, and <u>State v. Zarate</u>, 249 N.J. 359 (2022), support Laws' argument. In those matters, the Court created a procedure for juvenile offenders sentenced to the murder statute's mandatory thirty-year parole bar to seek a hearing after serving at least twenty years in prison for the sentencing court to assess the <u>Miller</u> factors, including "whether the juvenile offender still fails to appreciate risks and consequences, and whether he has matured or been rehabilitated," and "the juvenile offender's behavior in prison since the time of the offense." <u>Id.</u> at 370.

[7] The judge found aggravating factors three and nine substantially outweighed mitigating factor six. The judge considered but declined to find mitigating factors eight, ("defendant's conduct was the result of circumstances unlikely to

aggravating factor nine and failed to consider McNeil was only twenty-two years old when he committed the offense. In a footnote of his brief, McNeil also contends mitigating factor fourteen, (defendant was under the age of twenty-six when he committed the offense) N.J.S.A. 2C:44-1(b)(14), should be applied retroactively to his sentence. Further, while his appeal was pending, McNeil filed a letter pursuant to Rule 2:6-11(d), after the Court decided Comer and Zarate, to supplement his argument that youthful offenders are less likely to reoffend as they age. We are unpersuaded.

The trial judge's findings were supported by the record. As to aggravating factor nine, the judge explained the need for specific deterrence, stating "the tragedy of this case is that it didn't have to happen." Noting the first gun did not fire, and Laws "left the fight," the judge was persuaded the homicide occurred because McNeil handed him an operable gun. The judge appropriately considered the need for general deterrence, citing the "deep and profound effect" gun violence is having "on the City of Trenton." Cf. State v. Jarbath, 114 N.J. 394, 405 (1989) (recognizing "general deterrence unrelated to specific deterrence has relatively insignificant penal value").

---

recur"), and nine, (defendant's character and attitude indicate an unlikelihood of reoffending), N.J.S.A. 2C:44-1(b)(8) and (b)(9).

After McNeil's appeal was filed, the Court issued its decision in State v. Lane, 251 N.J. 84, 96 (2022), which held "that mitigating factor fourteen appl[ied] prospectively only." We thus reject defendant's argument to the contrary. Nor are we persuaded by McNeil's supplemental argument under Comer. As noted above, the Court's holding applies where the defendant was a juvenile and has served at least twenty years in prison. 249 N.J. at 401. McNeil fails to satisfy that criteria.

C.

Lastly, because the trial judge did not assess defendants' ability to jointly and severally pay the $18,637 restitution amount ordered, we are compelled to remand for an ability-to-pay hearing.

Because compensation to the victim is a relevant sentencing factor, the parties may include a restitution award in a plea agreement. State v. Corpi, 297 N.J. Super. 86, 92-93 (App. Div. 1997). Generally, however, the sentencing court should conduct a hearing to determine the defendant's ability to pay and the value of the victim's loss. See State v. Newman, 132 N.J. 159, 169 (1993). If "there is a good faith dispute over the amount of loss or [the] defendant's ability to pay," the court is required to conduct a restitution hearing to resolve those issues. State v. Jamiolkoski, 272 N.J. Super. 326, 329 (App. Div. 1994);

see also N.J.S.A. 2C:44-2(c). A remand also may be required where the victim's loss is uncontested, but the defendant's present or future ability to pay is unclear. See State in Interest of R.V., 280 N.J. Super. 118, 122-24 (App. Div. 1995). However, where there is no controversy as to the amount of the victim's loss and the defendant's ability to pay, a hearing may not be required. See State v. Orji, 277 N.J. Super. 582, 589-90 (App. Div. 1994).

The record before us contains no evidence about defendants' ability to pay, nor did defendants affirmatively concede the point. Unlike the defendant in Orji, who was sentenced to a probationary term, "ha[d] a bachelor's degree in marketing[,] and [wa]s gainfully employed as the owner operator of a limousine taxi service," 277 N.J. Super. at 589, defendants in the present matters were sentenced to lengthy prison terms, without gainful employment. Accordingly, we remand these matters for a hearing limited to determining whether defendants "presently or in the future will or should be able to pay the amount ordered." R.V., 280 N.J. Super. at 124.

Affirmed, but remanded solely for an ability-to-pay hearing.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4389-18